UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

EDDIE MYLES, JR. )
               Plaintiff, )
 )
v. ) No. 13 CV 50369
 ) Magistrate Judge Iain D. Johnston
CAROLYN COLVIN, Acting )
Commissioner of Social Security, )
               Defendant. )

**MEMORANDUM OPINION AND ORDER**

Plaintiff Eddie Myles, Jr. brings this action under 42 U.S.C. § 405(g), seeking remand of the decision denying him social security disability benefits. For the reasons set forth below, the decision is affirmed.

**BACKGROUND**

On January 31, 2011, plaintiff filed an application for supplemental security income, alleging that his disability began on January 1, 2009. R. 13. He was then 35 years old and had not worked in the last 10 years. It does not appear that, up until this point, he had ever sought treatment for any mental health issues.

In early February and then again in early March of 2011, plaintiff went to the Janet Wattles Center (sometimes also referred to by the parties as Rosecrance). Set forth below is a description, written by a non-doctor employee, of plaintiff's "presenting problem" at this time:

> Client has been on tracking for the last week due to suicidal ideation and inability to care for his daily grooming and hygiene needs. Cl has been isolating and not been leaving his apartment and has just experienced a loss as his partner of 6+ years has found a new partner and left him. Cl states that this is very hard for him but "I just can not handle it anymore." Cl appears agoraphobic, with fear of closed places (elevators, crowds, or even being out alone at times). Cl has a long history of using cannabis to relieve symptoms and has never been prescribed medication. Cl states that he hears voices and one sounds like his auntie who says, "things are going to be alright." Cl states that these come mostly

when he is using alcohol or cannabis. Cl only hears these when he is depressed. Cl has mismanaged anger by trying to run down his friend with a car. Cl shows passive self harm by biting his finger daily when he is angry. Cl has taken sleeping pills once with alcohol trying "not to wake up." Client is paranoid and does not trust many people as he has a history of them stealing from him and taking advantage of him. Cl has trouble sleeping, waking after 2 or 3 hrs with racing thoughts and has gained 25 lbs in the last 6 months which he thinks is due to overeating and depression. Cl has feelings of hopelessness and worthlessness and says he constantly worries about his family. Cl exhibits Agoraphobia without panic disorder as seen by not taking an elevator, not wanting to be outside the home alone, not standing in a crowd and panicking in the back seat of a car.

R. 203.

Sometime in March of 2011-- the exact time is not clear -- plaintiff stayed approximately a week at an overnight facility called Crisis Beds, which was run by the Janet Wattles Center. R. 40. As plaintiff's attorney explained, Crisis Beds is "kind of a step away from keeping someone out of the hospital by putting them in [Janet Wattles Center's ] own residential [program] where the psychiatrist from their facility will go to the residential program." R. 44. In other words, this was not a psychiatric hospitalization.

On March 11, 2011, plaintiff was first seen by psychiatrist Shahina Jafry. R. 230. Dr. Jafry met with plaintiff for 45 minutes and diagnosed him with "Bipolar d/o II depressed Anxiety d/o nos r/o panic d/o w agoraphobia; poly substance abuse." R. 230. She noted that plaintiff had recently experienced a break-up with a partner of six years who had been cheating on plaintiff. R. 231. She prescribed several drugs ("Seroquel XR, celexa, hydroxyzine") and advised plaintiff to stay away from alcohol and attend group therapy meetings known as PATH meetings. R. 229.[1]

Over the next year, plaintiff attended PATH meetings and periodically met with Dr. Jafry and counselors at the Janet Wattles Center. They recorded their observations in progress notes.

---

[1] Plaintiff explained at the hearing that PATH meetings are not led by a counselor or therapist. R. 40. It thus appears to function like a mutual support group.

As discussed below, Dr. Jafry generally found that plaintiff improved from this worst point during the breakup, although he still occasionally experienced some of his original symptoms, mostly when he stopped taking his medication. Dr. Jafry saw plaintiff every few months.

In April 2011, plaintiff was interviewed by a consulting clinical psychologist, Mark B. Langgut. R. 275-278. In a four-page report, Dr. Langgut summarized plaintiff's medical and life history, as reported by plaintiff, and then made various observations, including that plaintiff "presented himself as passive, allowing others to complete most activities of daily living for him," that plaintiff's "emotional presentation was within normal limits," that plaintiff had "deficient computational skills," that plaintiff had "impaired judgment and requires supervision and assistance in making appropriate decisions," and that plaintiff "had impaired insight into his own situation." R. 277-278. Under the heading "Diagnostic Considerations," he identified plaintiff as having "BiPolar Disorder II." R. 278.

On May 8, 2011, Dr. Michele Womontree, a state agency doctor, reviewed plaintiff's medical records and completed a form stating that plaintiff had a severe impairment but that it was not expected to last for 12 months. R. 280. Her main observation was that the "[o]nset of [plaintiff's] severe mental health problems seems to coincide with the loss of [plaintiff's] significant relationship early this year (2011)" and that plaintiff "appears to be responding to treatment and may be expected to recover significantly from this low point." R. 292.

About a year later, on June 29, 2012, the administrative law judge ("ALJ") held a hearing at which plaintiff, represented by counsel, testified. R. 29-51. On August 31, 2012, the ALJ issued his decision, finding that plaintiff's impairments (the primary one being bipolar illness) did not meet the Listing 12.04 (affective disorders), 12.06 (anxiety disorders), or 12.09 (substance abuse disorders). R. 15-16. In reaching this conclusion, the ALJ found that plaintiff

had a mild restriction in activities of daily living and had moderate difficulties in social function, but that he did not have marked difficulties in either of these two categories. R. 16. The ALJ then found that plaintiff had the residual functional capacity to perform a full range of work at all exertional levels with the limitation that "he needs to work alone, performing routine work that stays the same day-to-day." R. 17.

The crux of the ALJ's analysis is that plaintiff's "main stressor was the end of a six-year romantic relationship." R. 18. The ALJ noted that until this breakup, plaintiff had never received any formal treatment or psychotropic medication. *Id.* Then after the breakup, plaintiff showed improvement over the following year with the aid of counseling and medication.

## DISCUSSION

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). If supported by substantial evidence, the Commissioner's factual findings are conclusive. *Id.* Substantial evidence exists if there is enough evidence that would allow a reasonable mind to determine that the decision's conclusion is supportable. *Richardson v. Perales*, 402 U.S. 389, 399-401 (1971). Accordingly, the reviewing court cannot displace the decision by reconsidering facts or evidence, or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). However, the Seventh Circuit has emphasized that review is not merely a rubber stamp. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (a "mere scintilla" is not substantial evidence). If the Commissioner's decision lacks evidentiary support or adequate discussion, then the court must remand the matter. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). Moreover, a reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision. *Eichstadt v.*

*Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). Indeed, even when adequate record evidence exists to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not build an accurate and logical bridge from the evidence to the conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008).

Plaintiff argues that the ALJ wrongfully concluded that his bipolar illness did not meet Listing 12.04 (affective disorders). According to plaintiff, the ALJ committed two errors in reaching this conclusion. First, the ALJ improperly discounted the opinions of plaintiff's treating health professionals. Second, the ALJ improperly found that plaintiff's testimony was not fully credible. As explained below, neither argument justifies a remand.

**I.      The Treating Physician Rule.**

Plaintiff seeks to rely on treating physician rule, arguing that the ALJ gave "controlling weight" to the opinion of a non-examining state doctor (Dr. Womontree) while discounting plaintiff's treating healthcare providers.[2] Plaintiff argues that Dr. Womontree never examined plaintiff and that she rendered her opinion in May 2011, which was a full year before his hearing. Under 20 C.F.R. §404.1527(c)(2), a treating physician's opinion is entitled to controlling weight if it is supported by medical findings and consistent with other substantial evidence in the record. *Id.*; *Moore v. Colvin*, 743 F.3d 1118, 1127 (7th Cir. 2014).

Plaintiff's attempt to rely on this rule fails for several reasons. First, as a preliminary matter, it is difficult to evaluate this argument because plaintiff never clearly identifies *who* the treating physicians are, nor spells out *what* they specifically concluded. Plaintiff only quotes a few snippets of the record here and there and then uses generic and sporadic labels, such as

---

[2] Although plaintiff states that the ALJ gave "controlling" weight to Dr. Womontree's opinion, the ALJ actually gave it "substantial weight" and, more specifically, relied on her report as a "framework" for analyzing the evidence. R. 22.

"therapist," to refer to the healthcare workers whose opinions are being relied on. At other times, plaintiff simply treats the many healthcare workers he saw over a year as if they were one unified opinion-giver, referring to them collectively as "the psychiatrist and social workers at Rosecrance" or just "the providers at Rosecrance." Dkt. #11 at 6; Dkt. # 13 at 3. This approach has forced this Court to spend extra time trying to sort through the record to figure out these details. *See Martinez v. Colvin*, 2014 WL 1305067, *9 (N.D. Ill. Mar. 28, 2014) ("parties should not view judges as bloodhounds who are merely given a whiff of an argument and then expected to search the record high and low in an effort to track down evidence to locate and capture a party's argument"). These details are important and necessary. The regulations draw critical differences between the weight to be afforded various types of witnesses, including all manner of medical sources (both acceptable medical sources and other medical sources) as well as non-medical sources. *See* 20 C.F.R. §1527; 20 C.F.R. §404.1513; 20 C.F.R. §404.1502; SSR No. 06-03p ("only 'acceptable medical sources' can be considered treating sources, [] whose medical opinions may be entitled to controlling weight"). Accordingly, opinion witness testimony, particularly of medical sources cannot be lumped into an undifferentiated amalgam. Here, as it turns out, many of the opinions plaintiff relies on were not even made by a doctor. *See, e.g.* Dkt. # 11 at 8, 9; Dkt. # 13 at 2, 3.

Second, as the ALJ noted, these opinions are mostly unverifiable facts plaintiff told to healthcare workers. For example, plaintiff identifies as a medical opinion the fact that he "has not been able to keep a job because of his anger and does not have any close relationships with others." Dkt. # 13 at 3 (citing R. 344). But the employee recording this fact had no way of verifying whether plaintiff's anger caused him problems on a job because, among other reasons, he had not worked in the last ten years. There is nothing to suggest that the employee, in

recording this fact in plaintiff's medical record, was rendering a medical opinion as opposed to merely trying to accurately convey what plaintiff was reporting.

Third, and most important, the only person plaintiff has identified who could qualify as a treating physician is Dr. Jafry. However, after reviewing the record, this Court finds that Dr. Jafry's observations and opinions, which are fairly brief, generally support both the ALJ's decision and Dr. Womontree's opinion. In short, there is no conflict between the treating and consulting physicians.

As noted above, the ALJ concluded that plaintiff's problems in early 2011 were driven by the breakup of his six-year relationship and that, after this relative low point, plaintiff improved with the help of medications and therapy. Dr. Jafry's progress notes support this overarching theory. Dr. Jafry wrote that plaintiff identified the breakup of the six-year relationship as a factor causing him problems. R. 231; *see also* R. 203 (plaintiff reported that he had "just experienced a loss"). Other healthcare workers around this same time also noted that the breakup was a key factor in plaintiff's problems. *See* R. 263 (2/23/11 progress note stating that plaintiff was "still depressed re finally breaking up with his romantic partner yesterday but he feels he had to do so for his mental health"); R. 261 (2/25/11 progress note stating that plaintiff "still has periods of mild to moderate depression re recent break up with his romantic partner"); R. 246 (3/8/11 progress note stating that plaintiff is "now grieving the end of the relationship").

Over the next year, Dr. Jafry met with plaintiff every few months and consistently reported that he was either getting "better" or at least was "stable." *See* R. 321 (May 6, 2011 – plaintiff is "doing better"); R. 358 (July 1, 2011 – "better overall, still has some mood swings"); R. 361 (August 26, 2011 – "Overall functioning better"); R. 370-71 (Nov. 4, 2011 – "Overall functioning stable"); R. 383-84 (Feb. 3, 2012 – "Overall functioning stable"). The ALJ properly

conducted a longitudinal analysis of the medical records. *See Martinez v. Colvin*, 2014 WL 1305067 at *10 ("The Court stresses that having reviewed the entire record it is clear that the ALJ did not cherry pick the medical records, looking for evidence contrary to the Claimant's allegations. . . Instead, the record presented shows consistent evidence of the Claimant's stability.")

It is true, as plaintiff argues, that Dr. Jafry occasionally noted symptoms, such as mood swings or plaintiff's hallucination of seeing his deceased auntie on one occasion, that suggest improvement was not uniformly upward and that plaintiff was not completely rid of all his symptoms. However, Dr. Jafry generally attributed these problems to plaintiff's failure to take medicine or other temporary facts. *See, e.g.*, R. 361 ("he went off meds for 2 weeks [and] went to hospital for constipation as was on pain meds, now back on psychotropics x2 weeks feels better, lives in his own place"); R. 370 ("Medications out for 2 weeks but when takes meds helping"). Despite noting these symptoms, most of which were self-reported by plaintiff, Dr. Jafry adhered to her bottom-line conclusions that plaintiff was improving or stable, and she never recommended any new medications or more aggressive treatments.[3]

The ALJ acknowledged this counter-evidence in his opinion when he described plaintiff's visits with Dr. Jafry. R. 20. The ALJ noted, for example, that plaintiff had reported "feeling frustrated and agitated" at the November 4th visit. *Id.* After weighing this evidence, the ALJ nonetheless concluded that on balance the longitudinal picture painted by the year-long trail of progress notes from plaintiff's treating healthcare workers supported the larger conclusion that

---

[3] Some of the symptoms plaintiff claims the ALJ overlooked include "mood swings, frustration, and agitation." Dkt. # 11 at 8 (citing R. 370). As noted above, Dr. Jafry did not express any obvious concerns about these symptoms. It should also be noted that these symptoms are vague and hard to assess as they could also be made by healthy individuals dealing with stressful periods of daily life.

plaintiff had improved since the low point of the breakup. R. 21. Even plaintiff concedes that *some* evidence supports this theory. *See* Dkt. # 11 at 8 (acknowledging that plaintiff's medical records "described a few positive outcomes during treatment"); *id.* at 10 (acknowledging that plaintiff "experienced some slight progress in a year of treatment"). In sum, for the above reasons, the treating physician rule is inapplicable where, as here, there is no conflict between the opinions of the treating physician and the ALJ's decision.

## II.     The Credibility Determination.

Plaintiff's other argument is that the ALJ improperly found his testimony not fully credible. An ALJ's credibility determination should be reversed only if it is "patently wrong." *Minnick v. Colvin*, __ F.3d __, 2015WL 75273, * 7 (7th Cir. Jan. 7, 2015). At the same time, the Seventh Circuit has stated that a credibility determination may be reversed if the ALJ "fail[s] to adequately explain his or her credibility finding by discussing specific reasons supported by the record." *Id.*; *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008) (a credibility finding "must be specific enough to enable the claimant and a reviewing body to understand the reasoning."). Plaintiff's argument, which consists of just a few paragraphs in his opening and reply briefs, does not justify a remand.

To summarize, plaintiff has asserted that he has no friends and stayed for long stretches self-isolated in his apartment; that he has anger problems to such degree that he could not get along with others such as coworkers; and that he is incapable of managing his daily activities and has to depend on his mother to do things for him. Plaintiff argues that this testimony supports his claim that he qualifies as disabled under Listing 12.04 (anxiety disorders) because, among other qualifications, he had a "marked" restriction in the activities of daily living and in maintaining social functioning. Dkt. #11 at 9 n.2. Although the ALJ concluded that plaintiff had some

difficulty in these two areas and although he limited plaintiff to working alone, the ALJ was not persuaded by plaintiff's testimony that he had a "marked" restrictions in these two areas.

The Court finds that the ALJ pointed to specific evidence and sufficiently explained why he did not fully credit the above assertions. The ALJ noted, for example, that that a counselor called plaintiff on February 24, 2011, which was during the worst period of his symptoms, to see how he was doing, and plaintiff reported that he "was at a friend's home playing cards and enjoying the company of friends." R. 18; *see also* R. 19, 22. The ALJ noted that plaintiff "interacted satisfactorily" with all of treating and examining healthcare workers, which included many individuals over a year. R. 16. The ALJ pointed out that plaintiff regularly attended group therapy, and "no source has commented upon him becoming inappropriate during PATH group meetings." R. 22. These groups were not led by a counselor. The ALJ observed that in March 2012, plaintiff told healthcare providers that his strength was: "I'm a likeable person, I'm able to get along with most people." R. 22 (quoting R. 348).

As for plaintiff's claim that he could not handle the daily activities of living, the ALJ noted that plaintiff was living on his own and that his most recent treatment records showed that he was taking on the task of finding a new apartment because he wanted one that would have fewer stairs to climb. R. 16. The ALJ also pointed to a March 14, 2011 progress note stating that plaintiff reported that he "had been getting things done, instead of staying in bed and doing nothing." R. 19; R. 226. The above reasons provide sufficient explanation to support the ALJ's credibility finding.[4]

---

[4] Although the above evidence is sufficient on its own, the record contains additional evidence that would further support the ALJ's credibility findings. For example, although plaintiff claims he is incapable of taking care of himself, he told a counselor the following about his impending breakup with his partner: "[Client] reports he is still having mixed feelings over his relationship and does not know whether he should completely cut ties or *be there for his partner as a parent*

In conclusion, after a review of the record and the parties' briefs, the Court finds that ALJ discussed the relevant evidence, acknowledged counter-evidence, and pointed to specific and substantial evidence to support his decision. The Court finds that neither of the two arguments asserted by plaintiff warrant a remand. To the extent that plaintiff referred to isolated pieces of evidence not connected to the above two arguments, the Court finds that those arguments are undeveloped and in any event do not undermine the ALJ's rationale. *See Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir. 2010) ("The ALJ need not [] discuss every piece of evidence in the record and is prohibited only from ignoring an entire line of evidence that supports a finding of disability.").

## CONCLUSION

For the reasons given, plaintiff's motion for summary judgment is denied, the government's motion is granted, and the decision of the ALJ is affirmed.

Date: January 30, 2015    By: _____
Iain D. Johnston
United States Magistrate Judge

---

*figure*. [Client] explained that his partner never had parents who cared for him and *so [client] has been providing emotional and financial support*." R. 235 (emphasis added); *see also* R. 224 (stating that plaintiff "talked a lot to his new roommate" and "[t]hey get along very well").